UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------

FEDERAL DEPOSIT INSURANCE
CORPORATION AS RECEIVER FOR AMTRUST
BANK,

                    Plaintiff,

      v.

MICHAEL HODGE, et al.,

                    Defendants.

----------------------------------------------------------------

**MEMORANDUM & ORDER**
09-CV-3234 (MKB)

MARGO K. BRODIE, United States District Judge:

       AmTrust Bank ("AmTrust") filed a Complaint on July 28, 2009, against Defendant Lea

Jordan and others. (Docket Entry No. 1.) On January 7, 2010, the Federal Deposit Insurance

Corporation ("FDIC"), as Receiver for AmTrust Bank, was substituted as Plaintiff. (January 7,

2010 Order.) On July 31, 2012, and August 6, 2012, Plaintiff filed an Amended Complaint and a

corrected Amended Complaint, respectively against several persons and organizations, including

Defendants Liberty Land, Abstract, Inc. ("Liberty") and Atlas Abstract Agency Corp. ("Atlas"),

alleging that Defendants deprived Plaintiff of millions of dollars in proceeds from AmTrust's

loans. (Docket Entry Nos. 210–11.) Specifically, as to Atlas, Plaintiff asserts claims of breach

of contract, breach of fiduciary duty, negligence, fraud and conspiracy to commit fraud. As to

Liberty, Plaintiff asserts claims of negligence, fraud and conspiracy to commit fraud. Discovery

closed on February 21, 2013. (*See* Minute Entry dated February 21, 2013.) Atlas moved for

summary judgment on all claims against it. Plaintiff and Liberty cross-moved for summary

judgment on all claims against Liberty. The motions for summary judgment were referred to

Magistrate Judge James Orenstein for a report and recommendation.

By Report and Recommendation ("R&R") dated August 22, 2014, Judge Orenstein recommended that the Court: (1) grant Atlas' motion for summary judgment as to the claims of breach of contract, breach of fiduciary duty, negligent supervision, and negligence involving the Hempstead property; (2) deny Atlas' motion for summary judgment as to the claims of negligence involving the Willoughby Avenue and Jackson Heights properties, fraud and conspiracy to commit fraud; and (3) deny Liberty's and Plaintiff's cross-motions for summary judgment on all claims against Liberty. (Docket Entry ("DE") 294.) On September 12, 2014 Atlas filed objections.[1] (DE 296.) No other objections were filed. For the reasons set forth below, the Court adopts the R&R in its entirety.

## I. Background

### a. Relevant Parties

Between October 28, 2008, and February 12, 2009, AmTrust made twenty home mortgage loans to borrowers based in New York. (Compl. ¶ 4; DE 276 ¶ 1; DE 281.1 ¶ 1.)[2] AmTrust was closed by the Office of Thrift Supervision on December 4, 2009. (DE 276 ¶ 2; 281.1 ¶ 2.) FDIC was appointed as AmTrust's receiver and FDIC was substituted as Plaintiff in this action by Order dated January 7, 2010. (Jan. 7, 2010 Order.)

Link One Mortgage Bankers, LLC ("Link One") is a mortgage broker incorporated under the law of New York. (Compl. ¶ 32.) AmTrust contracted with Link One to provide brokerage

---

[1] Atlas filed duplicate objections on September 15, 2014. (DE 297.)

[2] Given the multiple parties and filings corresponding to the present motions for summary judgment, the Court will refer to the undisputed statement of facts submitted by each party, pursuant to Local Rule 56.1, by the following docket numbers: Docket Entry 276 (Atlas' statement of material facts); 281.1 (Plaintiff's response to Atlas' statement of material facts); 282.2 (Plaintiff's response to Liberty's statement of material facts); 283.2 (Plaintiff's statement of material facts); 287.8 (Liberty's statement of material facts); 290 (Liberty's response to Plaintiff's statement of material facts).

services and Link One brokered each of the subject loans. (*Id.* ¶¶ 33–34.) James G. Carroll represented AmTrust with respect to each of the subject loans. (*Id.* ¶ 38.)

Atlas is a New York company and acted as title agent in three of the subject loans. (DE 276 ¶ 6; DE 281.1 ¶ 6.) Liberty is a New York company and acted as a title agent with respect to two of the subject loans. (DE 287.8 at 1; DE 282.2 ¶ 1.) As title agents, Atlas and Liberty issued title commitments, which set forth, *inter alia*, the identity of the current vested owner of the property in question and the source of the vested owner's title.

**b. Defendants' alleged scheme**

Plaintiff alleges that Defendants have "engaged in or enabled" a mortgage fraud scheme in which "straw" borrowers applied to AmTrust Bank for loans. (Am. Compl. ¶ 1.) The borrowers purported that these loans were wanted in order to purchase residential properties from certain sellers at a fair value. (*Id.* ¶ 4.) However, at the time borrowers applied for the loans, and sometimes at the property closings, the alleged sellers did not actually own the subject properties. (*Id.* ¶ 6.) When an AmTrust loan closed, the alleged sellers would arrange to purchase the properties from the actual owners for a fraction of the price represented to AmTrust. (*Id.* ¶ 10.) The property would then be "flipped" and deeded to the borrower. (*Id.*) Pursuant to this scheme, Defendants successfully funded the purchase of property and absconded with hundreds of thousands of dollars in loan proceeds. (*Id.* ¶ 11.)

As succinctly stated in the R&R, "[t]he gravamen of [Plaintiff]'s claims against the title agent defendants, including Atlas and Liberty, is that they acted negligently or fraudulently with respect to the issuance of pre-closing title commitments that contained inaccurate or incomplete information regarding the title history of the subject properties." (R&R 2.) According to AmTrust, it relied on these title commitments in order to ensure compliance with its seasoning

requirement, which "required that title to the property be vested in the seller for at least three months . . . ."  (Brennan Aff. ¶ 5.)

      **c.   The Atlas Loans**

Atlas was involved in three subject loans.  (DE 276 ¶ 6; DE 281.1 ¶ 6.)  Specifically, Atlas was involved in loans pertaining to the following borrowers and properties: (1) Waltnel Sosa and 485 Willoughby Avenue, Brooklyn, New York ("Willoughby Avenue property"); (2) Kamrun Nahar and 35-16 87th Avenue, Jackson Heights, New York ("Jackson Heights property"); and (3) Lea Jordan and 140 Weir Street Hempstead, New York ("Hempstead property").  (DE 276 ¶ 7; DE 281.1 ¶ 7.)  Originally, Morning Star Abstract, LLC ("Morningstar") was meant to be the title agent at the closing of the three loans.  (DE 276 ¶ 10; DE 281.1 ¶ 10.)  Atlas' title insurer, Security Title Guaranty Company of Baltimore ("Security") was also the title insurer for Morningstar.  (DE 276 ¶ 10; DE 281.1 ¶ 10.)  After Morningstar ceased operations, an attorney for Security, John Montinico, asked Felice McMahon, the sole owner of Atlas, to "take over" Morningstar's files.  (DE 276 ¶¶ 9–10; DE 281.1 ¶¶ 9–10.)  Montinico brought Atlas the files and directed Atlas to use Michelle Baker as the title closer, given her familiarity with the files. (DE 276 ¶ 10; DE 281.1 ¶ 10.)  Baker attended the closings of all three loans, acting as the title closer on behalf of Atlas.  (DE 276 ¶ 12; DE 281.1 ¶ 12.)

      **i.  Willoughby Avenue property**

Atlas prepared a title commitment for the Willoughby Avenue property.  (Deposition of Felice McMahon ("Atlas Dep."), annexed to the Affidavit of Felice McMahon ("McMahon

Aff.") as Ex. A, 90:10–12.)  There are two "Schedule A" forms in the record.[3]  One Schedule A

("First Schedule A") represents that effective January 11, 2009, Brooklyn Renaissance &

Development, Inc. ("BRD") acquired the Willoughby Avenue property by deed, dated

September 25, 2008, from UBS Real Estate Securities, Inc. ("UBS").  (Atlas Dep. 123:2–23; Ex.

1, annexed to the Affidavit of Melanie Burke ("Burke Aff.").)  The First Schedule A was

incorrect.  The second Schedule A form ("Second Schedule A") represents that effective January

11, 2009, UBS acquired the Willoughby Avenue property by deed dated April 15, 2008, from

U.B. Bank National Association.[4]  (Ex. C, annexed to McMahon Aff.)

On February 2, 2009, when the Willoughby Avenue property loan closed, BRD did not

actually own the Willoughby Avenue property as purported by the First Schedule A.  Instead,

UBS was the owner of the Willoughby Avenue Property and a deed, obtained from the

Automated City Register System ("ACRIS"), shows that on February 25, 2009, UBS transferred

the property to U.S. Bank National Association in a trustee capacity.  (Ex. A-2, annexed to the

Affidavit of James Defeo ("Defeo Aff.").)  Another deed recorded that same day transferred the

Willoughby Avenue property from U.S. Bank to BRD.  (Ex. A-3, annexed to Defeo Aff.)

### ii. Jackson Heights property

Morningstar prepared the title commitment for the Jackson Heights property and

---

[3]  Schedule A forms, produced by Atlas, list the mortgagor, mortgagee, the amount of the
mortgage, and mortgage tax paid.  (Deposition of Felice McMahon ("Atlas Dep."), annexed to
the Affidavit of Felice McMahon ("McMahon Aff.") as Ex. A, 58:12–17.)

[4]  "U.B. Bank National Association" appears to be a typographical error as "U.S. Bank
National Association" is the entity that appears in the verified chain of title.

subsequently provided the title commitment to AmTrust.[5]  Morningstar's Schedule A represents

that effective January 10, 2009, Bangladesh American Trading, Inc. ("Bangladesh") acquired the

property by deed, dated August 21, 2008, from Bashir Rahman.  (Burke Aff. ¶¶ 11–12 Ex. 6.)

Morningstar's title also indicates that Bashir Rahman acquired the property by deed, dated

February 21, 2006, from Nicholas Montes and Ines Montes.  (*Id.*)  Morningstar's title

commitment was inaccurate.  Atlas' Schedule A for the Jackson Heights property represents that

effective January 28, 2009, Bashir Rahman acquired the property by deed, dated February 21,

2006, from Nicholas Montes and Ines Montes.  (Defeo Aff. Ex. G.)  The deed transferring the

property Bashir Rahman to Bangladesh was not recorded until February 6, 2009.  (Defeo Aff.

Ex. F.)  The Jackson Heights property loan closed on February 4, 2009.  (Atlas Dep. 141:7–23.)

### iii. Hempstead property

Morningstar prepared the title commitment for the Hempstead property.  (DE 281.1 ¶ 21;

Divney Decl. ¶ 9.)  Morningstar's Schedule A represented that effective October 1, 2008, Bell

Property & Management, Inc. ("Bell") acquired the property by deed, dated August 5, 2008,

from Freemont Investment & Loan, Inc. ("Freemont").  (DE 281.1 ¶¶ 39–40; Divney Decl. Ex.

F.)  Morningstar's Schedule A was inaccurate.  The Hempstead property was acquired by HSBC

Bank, as the trustee under a Pooling and Service Agreement with Freemont Home Loan 2005-D,

from Freemont by deed, dated December 9, 2008.  (DeFeo Aff. Ex. A-1; Atlas Dep. 179:23–

180:3.)  HSBC bank transferred the property to Bell by deed, dated December 10, 2008.  (Atlas

Dep. 181:10–18.)  At the closing, the Schedule A prepared by Atlas represented that effective

September 22, 2008, Bell (handwritten and crossing out the text "Freemont Investment & Loan")

---

[5]  Although no party directly confirmed this transfer, Judge Orenstein made this factual finding based on the "MOR" prefix on the title commitment.  (R&R 8 n.4.)  Atlas did not contest this factual finding.

acquired the property by deed, dated September 4, 2007, from David Kessler, Esq.  (DeFeo Aff. Ex. A-5; Atlas Dep. 172:23–174:24.)  The Schedule A also indicates that the title to the property was recertified in Jordan's name from Bell, effective January 9, 2009.  (DeFeo Aff. Ex. A-5; Atlas Dep. 172:23–174:24.)

## II.  Discussion

### a.  Standard of Review

#### i. Report and Recommendation

A district court reviewing a magistrate judge's recommended ruling "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).  When a party submits a timely objection to a report and recommendation, the district court reviews the parts of the report and recommendation to which the party objected under a *de novo* standard of review.  28 U.S.C. § 636(b)(1)(C); *see also Larocco v. Jackson*, No. 10-CV-1651, 2010 WL 5068006, at *2 (E.D.N.Y. Dec. 6, 2010).  The district court may adopt those portions of the recommended ruling to which no timely objections have been made, provided no clear error is apparent from the face of the record.  28 U.S.C. § 636(b)(1)(C); *see also Larocco*, 2010 WL 5068006, at *2.   The clearly erroneous standard also applies when a party makes only conclusory or general objections, or simply reiterates its original arguments.  *See Rahman v. Fischer*, No. 10-CV-1496, 2014 WL 688980, at *1 (N.D.N.Y. Feb. 20, 2014) ("If no objections are made, or if an objection is general, conclusory, perfunctory, or a mere reiteration of an argument made to the magistrate judge, a district court need review that aspect of a report-recommendation only for clear error." (citations omitted)); *Time Square Foods Imports LLC v. Philbin*, No. 12-CV-9101, 2014 WL 521242, at *2 (S.D.N.Y. Feb. 10, 2014) (clearly erroneous standard applies when party reiterates arguments made to the

magistrate judge); *see also DePrima v. City of New York Dep't of Educ.*, No. 12-CV-3626, 2014 WL 1155282, at *3 (E.D.N.Y. Mar. 20, 2014) (collecting cases).

### ii. Summary Judgment

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Bronzini v. Classic Sec., L.L.C.*, 558 F. App'x 89, 89 (2d Cir. 2014); *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013); *Kwong v. Bloomberg*, 723 F.3d 160, 164–65 (2d Cir. 2013). The role of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 162 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* The court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

### b. Unopposed recommendations

Plaintiff and Liberty did not object to Judge Orenstein's R&R and Atlas only objected to certain recommendations. The Court has reviewed the unopposed portions of the R&R, and, finding no clear error, the Court adopts those recommendations pursuant to 28 U.S.C. § 636(b)(1). Specifically, the Court (1) grants Atlas' motion for summary judgment as to the

claims of breach of contract, breach of fiduciary duty, negligent supervision, and negligence involving the Hempstead property; (2) denies Liberty's motion for summary judgment as to the claims of negligence, fraud, and conspiracy; and (3) denies Plaintiff's motion for summary judgment on its claims against Liberty.

### c. Atlas' objections

Atlas objects to Judge Orenstein's recommendations denying Atlas' motion for summary judgment as to the remaining negligence claims, fraud and conspiracy claims. For the reasons discussed below, the Court adopts Judge Orenstein's recommendations and denies Atlas' motion for summary judgment as to these claims.

### i. Negligence

To establish a *prima facie* case of negligence under New York law, "a plaintiff must demonstrate '(1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty, and (3) injury to the plaintiff as a result thereof.'" *In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 758 F.3d 202, 210 (2d Cir. 2014) (quoting *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 428 (2d Cir. 2013) and *Akins v. Glens Falls City Sch. Dist.*, 53 N.Y.2d 325, 333 (1981)); *see also Solomon by Solomon v. City of New York*, 66 N.Y.2d 1026, 1027 (1985) (stating elements); *Jiminez v. Shahid*, 922 N.Y.S.2d 123, 124 (App. Div. 2011) (same). Furthermore, Plaintiff must establish that his injury was foreseeable. *See Sanchez v. State of New York*, 99 N.Y.2d 247, 252 (2002) ("[L]iability does not attach unless the harm is within the class of reasonably foreseeable hazards that the duty exists to prevent.").

Plaintiff alleges that Atlas acted negligently, with respect to all three loans in which Atlas participated. Judge Orenstein recommended that the Court deny Atlas' motion for summary

judgment as to the Jackson Heights and Willoughby Avenue property. Each property is discussed below.

### 1. Jackson Heights property

With respect to the Jackson Heights property, Judge Orenstein found that a triable issue of material fact existed as to whether Atlas "either prepared or ratified the title commitment" and "failed to correct the inaccuracies in the documents Morningstar prepared after taking over the file." (R&R 17–18.) However, Judge Orenstein recommended that the Court grant partial summary judgment in Atlas' favor by dismissing any claims based on negligent supervision of Baker due to an absence of any evidence permitting an inference that Baker caused AmTrust to rely to its detriment on the false information in the title commitment. (*Id.* at 19.) Atlas objects to each ground upon which Judge Orenstein recommended that the Court deny summary judgment.

### A. Atlas' preparation or ratification of the title commitment

Although Morningstar produced the title commitment to the Jackson Heights property, the title commitment bears an effective date of January 10, 2009, as well as a fax stamp, which bears the date of January 29, 2009. (Divney Decl. Ex. G) Both dates are subsequent to Morningstar ceasing operations. (DE 276 ¶¶ 9–10; DE 281.1 ¶¶ 9–10.) Judge Orenstein noted that although "[s]uch evidence is by no means conclusive, . . . it creates a genuine issue as to whether Atlas adopted the Jackson Heights title commitment . . . by updating it or faxing it to AmTrust or one of its agents after Atlas took over from Morningstar." (R&R 17.) Atlas objects to Judge Orenstein's reliance on the January 10, 2009 date because there is no proof, nor does the R&R cite to any, that Atlas updated the title commitment to reflect January 10, 2009. Atlas also objects to Judge Orenstein's reliance on the fax stamp because there is no phone number listed, thereby the fax stamp does not indicate who faxed the document on January 29, 2009.

Although Atlas is correct in that there is no proof that it updated the title commitment on January 10, 2009, Atlas did "take over" Morningstar's responsibilities, (Atlas Dep. 21:22–22:1), and was paid for "[t]itle charges," (DeFeo Aff. Ex. O). The Court agrees with Judge Orenstein that while this circumstantial evidence is far from "conclusive," it is enough to create a dispute as to a material fact, mainly, whether Atlas, ratified or adopted Morningstar's erroneous title commitment. Therefore, the Court adopts Judge Orenstein's recommendation and denies Atlas' motion for summary judgment on this ground.

### B. Atlas' failure to correct the inaccuracies of the tile commitment

Judge Orenstein also concluded that, "even if Atlas neither prepared nor ratified Morningstar's title commitments for the Jackson Heights . . . propert[y], it nevertheless breached its duty of care to AmTrust . . . ." (R&R 18.) Judge Orenstein supported his conclusion by relying on the fact that Atlas had in its possession an accurate Schedule A, which reflected that the Jackson Heights property did not meet AmTrust's seasoning requirement. Atlas's objection is two-pronged.

First, Atlas appears to argue that Judge Orenstein drew the incorrect inference from the fact that Atlas had in its files an alternative Schedule A that contained accurate information as to the chain of title related to the Jackson Heights property. (Atlas Obj. 9.) Atlas argues that its accurate Schedule A proves "that Atlas provided the correct information as to chain of title when they prepared their own title report." (*Id.* at 9.) Atlas has identified a plausible and reasonable inference, however, just as plausible and reasonable is the position articulated by Judge Orenstein in the R&R. Because the Court must draw all inferences in favor of the non-moving party, the Court finds that the accurate Schedule A in Atlas' possession is proof that it knew or

should have known that the Schedule A transmitted to AmTrust contained erroneous information.

Second, Atlas argues that Plaintiff's evidence concerning AmTrust's seasoning requirement is inconsistent and therefore unreliable. (*Id.*) Atlas notes that Edward Brennan, a former AmTrust underwriter, testified that the seller had to be in title for three months prior to closing in order for the loan to be approved yet AmTrust's closing instructions to Carroll, its attorney, required that the seller be in title for one year prior to closing. (*Id.*) Any inconsistency in the evidence presented on AmTrust's seasoning requirement is peripheral to the question at hand: whether Atlas negligently failed to review the title commitment prepared by Morningstar to ensure that is contained accurate information. The Court adopts Judge Orenstein's recommendation and denies Atlas' motion for summary judgment on this ground.

### C. Causation

The R&R did not discuss causation. Atlas argues that any conduct or omission on its part was not the proximate cause of any damage suffered by AmTrust. (Atlas Obj. 11.)

"A [plaintiff] may act negligently without that negligence constituting a proximate cause of the accident. In order to find that [plaintiff's] negligence was a proximate cause of the harm caused, the jury must find that the negligence was a substantial factor in bringing about the injury." *Saladino v. Stewart & Stevenson Servs., Inc.*, 704 F. Supp. 2d 237, 249 (E.D.N.Y. 2010) (quoting *Forlastro ex rel. Estate of Forlastro v. Collins*, No. 07-CV-3288, 2008 WL 2791277, at *4 (S.D.N.Y. 2008)); *see also Clinton v. Brown & Williamson Holdings, Inc.*, No. 05-CV-9907, 2013 WL 3111122, at *9 (S.D.N.Y. June 20, 2013) ("In assessing whether one cause among many constitutes proximate cause, courts have engaged in inquiries such as whether a cause is a substantial factor in bringing about the harm, or whether the cause is too remotely or

insignificantly related to the harm to be a legal basis for liability.") "Proximate cause serves to limit, for legal or policy reason, the responsibility of an actor for the consequences of his conduct." *Aegis Ins. Servs., Inc. v. 7 World Trade Co., L.P.*, 737 F.3d 166, 178 (2d Cir. 2013) (quoting *Monahan v. Weichert*, 442 N.Y.S.2d 295, 298 (App. Div. 1981)).

Atlas notes that the erroneous title commitment concerning the Jackson Heights property did not indicate that the owner had title for over a year, thus, Atlas argues that Carroll failed in his responsibility to ensure that AmTrust's seasoning requirement was satisfied. (Atlas Obj. 11.) Atlas further argues that had Carroll performed his duty, AmTrust would have suffered no loss. (*Id.* at 12.) The Court rejects Atlas' argument for two reasons. First, other evidence in the record indicates that AmTrust's seasoning requirement was only that the owner have title for three months prior to the application date. (Brennan Aff. ¶ 5; *id.* Ex. 8.) This issue is disputed and better left to a jury. Second, it is well established that "[t]here can be more than one proximate cause of an accident." *Calderon-Scotti v. Rosenstein*, --- N.Y.S.2d ---, 2014 WL 3444280, at *1 (N.Y. App. Div. July 16, 2014) (quoting *Cox v. Nunez*, 805 N.Y.S.2d 604, 605 (App. Div. 2005)); *see also Auz v. Century Carpet, Inc.*, No. 12-CV-417, 2014 WL 199511, at *3 (S.D.N.Y. Jan. 17, 2014) ("There can be more than one proximate cause of an accident, and the issue of comparative negligence is generally a question for the jury to decide." (quoting *Jahangir v. Logan Bus Co., Inc.*, 933 N.Y.S.2d 402, 403 (App. Div. 2011) (internal quotation marks omitted)). If Carroll and other AmTrust agents who relied upon the title commitments were acting pursuant to a three-month seasoning requirement, then Plaintiff has established that the false chain of title information was a substantial factor in causing AmTrust's injury. Given the outstanding factual dispute concerning the seasoning requirement, summary judgment is inappropriate. Accordingly, the Court adopts Judge Orenstein's recommendation and denies

Atlas' motion for summary judgment as to Plaintiff's negligence claim based on the Jackson Heights property.

## 2. Willoughby Avenue property

With respect to the Willoughby Avenue property, because Atlas conceded that it prepared the title commitment — but argued that the version in AmTrust's file was altered by another party — Judge Orenstein found that a jury could find that Atlas negligently prepared the title commitment in AmTrust's files. (R&R 18–19.) Atlas argues that the title commitment it prepared contained completely different information than that in AmTrust's files and that there is no evidence that the title commitment in AmTrust's files was prepared by Atlas. (Atlas Obj. 10.) There is no question that Atlas alone was responsible for the title commitment prepared for the Willoughby Avenue property. Although Atlas argues that it never prepared Schedule A in AmTrust's possession, Baker testified otherwise. (*Compare id.*, *with* Baker Dep. 199:11–13.) The dispute is material and thus must be decided by a jury. In addition, for the same reason as discussed above with respect to the Jackson Heights property, there is a disputed issue of material fact as to proximate cause that precludes granting Atlas' summary judgment motion. Accordingly, the Court adopts Judge Orenstein's recommendation and denies Atlas' motion for summary judgment as to Plaintiff's negligence claim based on the Willoughby Avenue property.

### ii. Fraud

In order to prevail on a claim of fraud, under New York law, a plaintiff must prove five elements by clear and convincing evidence: "(1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff."

*Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir. 2006) (citing *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997)); *Gladstone Bus. Loan, LLC v. Randa Corp.*, No. 09-CV-4225, 2009 WL 2524608, at *3 (S.D.N.Y. Aug. 17, 2009) (quoting *Schlaifer Nance & Co.*, 119 F.3d at 98); *see also Eurycleia Partners, LP v. Seward & Kissel, LLP*, 12 N.Y.3d 553, 559 (2009) ("The elements of a cause of action for fraud require a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages.").

Judge Orenstein recommended that the Court deny Atlas' motion for summary judgment on Plaintiff's fraud and conspiracy claims. (R&R 20.) Atlas objects, arguing that Atlas never communicated with AmTrust and even if a misrepresentation was made, AmTrust did not rely on it. (Atlas Obj. 3–7.) Each argument is discussed below.

### 1. Atlas' communication

Atlas argues that it never made a misrepresentation to AmTrust because AmTrust never received any loan documents from Atlas. (Atlas Mem. 3.) Instead, AmTrust received all loan documents from its mortgage broker, Link One, or from its attorney, Carroll, "through a process by which [Link One or Carroll] would upload the loan documents to Am[T]rust's Gemstone lending system . . . ." (*Id.*) Atlas argues that, because it did not have access to the Gemstone lending system, "if any of the pre-approval loan documents constituted a misrepresentation that was materially false, it was Link One, not Atlas, that made the representation to Am[T]rust." (Atlas Obj. 6–7.) The R&R did not address this argument. The Court finds the argument without merit.

Atlas, as title agent for the three loans in question, at the very least, expected that its title commitments would reach an agent of AmTrust. As McMahon confirmed at her deposition,

Atlas was responsible for providing an accurate description of title at the time of closing. (Atlas Dep. 18:25–19:4.) The title commitments prepared by Atlas were normally sent to the buyer's attorney, the seller's attorney, the bank attorney and the closer prior to closing. (*Id.* at 52:3–12.) Thus, by McMahon's own testimony, Atlas, in the normal course of business, did make representations to the agents of banks, if not the banks themselves. This is sufficient to create a genuine dispute as to whether Atlas made any representations in the instant case.[6] *See Sec. Investor Prot. Corp. v. BDO Seidman, LLP*, 222 F.3d 63, 77 (2d Cir. 2000) (noting that "so long as the plaintiff receives the substance of a defendant's misstatements, he or she may establish reliance on that information even if the defendant did not communicate with the plaintiff directly"); *Municipality of Bremanger v. Citigroup Global Markets Inc.*, No. 09-CV-7058, 2013 WL 1294615, at *19 (S.D.N.Y. Mar. 28, 2013) (noting that "a principal may recover for misrepresentations relied on by an agent" so long as such reliance is reasonable), *aff'd sub nom. Mun. Corp. of Bremanger v. Citigroup Global Markets Inc.*, 555 F. App'x 85 (2d Cir. 2014); *Jay Dees Inc. v. Defense Tech. Sys., Inc.*, No. 05-CV-6954, 2008 WL 4501652, at *5 (S.D.N.Y. Sept. 30, 2008) ("Reliance need not result from direct communication from defendant to plaintiff. There is no reason why a misrepresentation to the plaintiff's agent does not suffice . . . ."); *see also In re Beacon Associates Litig.*, 745 F. Supp. 2d 386, 408 (S.D.N.Y. 2010) (noting, in the securities fraud context, that "[i]t would be a strange result to allow a third party to make misrepresentations to a principal's agent, . . . and permit the third party to escape liability to the

---

[6] At her deposition, McMahon believed that one title report "might have went to James Carroll at time of closing or prior to closing." (Atlas Dep. 52:13–19.) In its objections, Atlas clearly states that "[a]ny title reports prepared by [it] would have had to be sent to Link One or Carroll to upload into Gemstone." (Atlas Obj. 13–14.) Atlas, perhaps inadvertently, has identified the basis for denying summary judgment as to whether it ever made a representation to AmTrust.

principal"); *cf. Rosen v. Spanierman*, 894 F.2d 28, 33 (2d Cir. 1990) ("A third party can recover damages for a fraudulent misrepresentation if he can establish that he relied upon it to his detriment, and that the defendants intended the misrepresentation to be conveyed to him."); *In re Windsor Plumbing Supply Co., Inc.*, 170 B.R. 503, 529 (Bankr. E.D.N.Y. 1994) ("A plaintiff to whom the representations are not made directly may not recover for fraud unless the defendant intended or expected the misrepresentation to reach that particular plaintiff, or a class of persons including the plaintiff.").

### 2. Reliance

Atlas' primarily objection to Judge Orenstein's recommendation is based on the reliance element of Plaintiff's fraud claim. Atlas argues that Judge Orenstein erroneously concluded that AmTrust's underwriters were required to, and did, review title commitments prior to the closing of each loan in question. (Atlas Obj. 3.) According to Atlas, such a factual finding ignores the testimony of Stephen Trayte, former Senior Vice-President of Residential Credit for AmTrust. (*Id.*) Trayte testified that the closing attorney is responsible for verifying that title is clear at closing, and that it is not a requirement that AmTrust's underwriters review a certificate of title prior to closing. (Trayte Dep. 112:23–113:19.) Atlas concedes that Trayte further testified that if the title commitment were available prior to closing, it would be reviewed by AmTrust's underwriters, (*id.* at 113:10–12), but argues that it is "sheer speculation" that any such title commitment was reviewed with respect to any of the subject loans.

With respect to the Willoughby Avenue property, Atlas ignores that Judge Orenstein, in addition to relying on Trayte's testimony, also cited to a Notice of Loan Approval ("NOLA") form indicating that a preliminary title report was reviewed by AmTrust prior to closing. (*See* Willoughby Avenue NOLA, annexed to Burke Aff. as Ex. 3.) The NOLA pertaining to

Willoughby Avenue creates a genuine dispute as to whether AmTrust relied on an erroneous title commitment prior to closing.

AmTrust's files did not include a NOLA corresponding to the Jackson Heights property. However, the Jackson Heights property file did contain an Underwriter Findings Report ("UFR"), which indicated that a preliminary title report was required to ensure that the title commitment met all of AmTrust's requirements. (Jackson Heights UFR, annexed to Burke Aff. as Ex. 5.) Burke, a former AmTrust Senior Qualify Control Analyst/SIU, identified the title commitment with erroneous chain of title information, as the title commitment which was received and maintained by AmTrust in the regular course of business as a business record. (Burke Aff. ¶ 12.) Brennan, a former AmTrust underwriter, states that as an underwriter, he would recommend loans for denial if the chain of title did not conform to AmTrust's seasoning requirements. (Brennan Aff. ¶ 6.) He further states that an underwriter was required to review title commitments to verify compliance AmTrust seasoning requirements. (*Id.* ¶ 7.) And, Brennan further states that "AmTrust underwriters relied on the accuracy of the title commitments provided by the title agents prior to the closing for the Willoughby Avenue [t]ransaction . . . and for the 87th Street [t]ransaction [Jackson Heights property] when they approved the loans for closing." (*Id.* ¶ 16.) This evidence suffices to create a genuine dispute as to whether, with respect to the Jackson Heights property, AmTrust reviewed and relied on a title commitment prior to closing the loan. Although Atlas notes that Brennan did not definitively state when the policy — that underwriters review title commitments — took effect,[7] drawing all inferences in favor of the non-moving party, the Court assumes that such a policy was in effect

_____

[7] At his deposition, Brennan stated that the requirement that an underwriter review title commitments was added "at some point in my employment . . . ." (Brennan Dep. 75:11–17.)

before February 4, 2009, during the period prior to the closing of the Jackson Heights loan.[8] Atlas' argument that such a policy was not in effect during the operative period is better directed toward a jury. Therefore, the Court adopts Judge Orenstein's recommendation and denies Atlas' motion for summary judgment as to Plaintiff's fraud claim.

### iii. Conspiracy

In addition to an underlying tort, a civil conspiracy claim requires Plaintiff to satisfy the following elements: "(1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury.'" *Bigio v. Coca-Cola Co.*, 675 F.3d 163, 176 (2d Cir. 2012) (quoting *Abacus Fed. Sav. Bank v. Lim*, 905 N.Y.S.2d 585, 588 (App. Div. 2010) (internal quotation marks omitted)), *cert. denied*, 568 U.S. ---, 133 S. Ct. 952, (2013); *Decter v. Second Nature Therapeutic Program, LLC*, --- F. Supp. 2d ---, ---, 2014 WL 4378805, at *11 (E.D.N.Y. Sept. 5, 2014) (stating elements); *Apace Commc'ns, Ltd. v. Burke*, --- F. Supp. 2d ---, ---, 2014 WL 1672618, at *7 (W.D.N.Y. Apr. 28, 2014) (same).

Judge Orenstein recommended that the Court deny Atlas' motion for summary judgment as to Plaintiff's civil conspiracy claim. (R&R 20.) Atlas argues that Judge Orenstein cited to no evidence demonstrating that Atlas had an agreement with anyone, performed an overt act in

---

[8] The Court draws a similar favorable inference with respect to the effect of AmTrust's seasoning requirement as set forth in its Seller's guide. (*See* Seller's Guide, annexed to Burke Aff. as Ex. 11.) Although the document itself is dated December 4, 2009, there is nothing in the record to suggest that the Seller's Guide, and its corresponding seasoning requirement, was not in effect during the period prior to the closing of the Willoughby Avenue and Jackson Heights property loans.

furtherance of any agreement or intentionally participated in the furtherance of any plan or

purpose.[9]  (Atlas Obj. 17.)

      Plaintiff makes no allegation of an express agreement between any Defendants.

However, absence of such an allegation is not fatal to Plaintiff's claim.  "Usually the only

evidence available is that of disconnected acts on the part of the individual conspirators, which

acts, however, when taken together in connection with each other, show the conspiracy to secure

a particular result quite as satisfactorily and conclusively as more direct proof."  *Keviczky v.*

*Lorber*, 290 N.Y. 297, 302 (1943); *Dell's Maraschino Cherries Co. v. Shoreline Fruit Growers,*

*Inc.*, 887 F. Supp. 2d 459, 482 (E.D.N.Y. 2012) ("As is true in criminal conspiracies, agreements

in civil conspiracies will not easily be shown by direct evidence, but may be inferred from

circumstantial evidence." (quoting *Cofacredit S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d

229, 240 (2d Cir. 1999))); *Miltland Raleigh-Durham v. Myers*, 807 F. Supp. 1025, 1053

(S.D.N.Y. 1992) ("The formal agreement which defendants say is a necessity is not required.");

*First Fed. Sav. & Loan Ass'n of Pittsburgh v. Oppenheim, Appel, Dixon & Co.*, 629 F. Supp.

427, 443 (S.D.N.Y. 1986) ("The lack of an express allegation of an agreement is not fatal to the

plaintiffs' conspiracy claims.").

      As discussed above, *infra* Part II.c.ii, a jury could reasonably find that Atlas intentionally

sought to defraud AmTrust.  There is a genuine dispute as to whether Atlas created an erroneous

title commitment for the Willoughby Avenue property and created or intentionally failed to

correct an erroneous title commitment for the Jackson Heights property.  Judge Orenstein posited

that there was no incentive for Atlas to defraud AmTrust unless pursuant to an agreement with

---

[9]  Atlas' objections to Judge Orenstein's conspiracy recommendation reassert the arguments already addressed and dismissed by the Court with respect to Plaintiff's underlying negligence and fraud claims.  Those arguments merit no further discussion.

others to get some benefit beyond its usual fee.  The Court finds that this is a reasonable inference drawn in Plaintiff's favor.  If a jury believes that AmTrust committed intentional fraud, it may also believe that a possible explanation for such misbehavior would be the collection of some nefarious benefit pursuant to a tacit agreement between Atlas and others.  In addition, in order for any benefit to accrue from the alleged scheme, the alleged co-conspirators would have been dependent upon each other's performance.  A reasonable jury could infer from such interdependence that the parties were operating pursuant to a tacit agreement.  *See Environmental Servs., Inc. v. Recycle Green Servs., Inc.*, --- F. Supp. 2d ---, ---, 2014 WL 1259959, at *10 (E.D.N.Y. Mar. 25, 2014) (noting, in the context of conspiracy claims pursuant to the Racketeer Influenced and Corrupt Organizations Act and common law, that "interdependence of activities and persons involved" can allow an inference of an implicit agreement between the parties); *Dell's Maraschino Cherries Co.*, 887 F. Supp. 2d at 483 (denying summary judgment on the plaintiff's conspiracy claim due to the "interwoven nature of the relationship among" the alleged conspirators).

The Court also notes that McMahon testified to several acts which, drawing an inference in Plaintiff's favor, could support the existence of a conspiracy to defraud AmTrust.  McMahon admitted that the actions and files of Baker, the title closer, made McMahon "uncomfortable," yet Atlas continued with the three loans in question.  (Atlas Dep. 30:19–24; 32:12–14.)  Atlas also continued with its relationship with Baker despite an interaction with a "contact" of Baker's, Dirk Hall, who showed up at McMahon's home cursing and screaming.  (*Id.* at 29:7–18; 79:25–80:6.)  Hall was involved, in some capacity, in the closing of the Willoughby Avenue property.  (*Id.* at 89:21–90:2.)  Atlas also sent Hall an email discussing the Jackson Heights property, yet McMahon "ha[d] no idea" why Hall would have received such a communication from Atlas.

(*Id.* at 160:3–15.)  From these discrete acts, in addition to the underlying tort of fraud already discussed, a jury could infer that Atlas, Baker, Hall and/or others were acting pursuant to an agreement to defraud AmTrust.

Atlas argues that the evidence in the record supports the conclusion that no agreement existed between any relevant party.  Namely, Atlas never heard of Link One and had never meet Carroll, Baker or Hall prior to receiving Morningstar files.  (Atlas Obj. 14.)  Atlas' lack of familiarity with the alleged co-conspirators may convince a jury that there was no conspiracy at work here, but such an argument does not warrant granting Atlas' motion for summary judgment.  The Court adopts Judge Orenstein's recommendation and denies Atlas' motion for summary judgment as to Plaintiff' conspiracy claim.

## III.  Conclusion

Having considered Magistrate Judge Orenstein's Report & Recommendation and the accompanying objections, the Court adopts the Report & Recommendation in its entirety.

The Court (1) grants Atlas' motion for summary judgment as to the claims of breach of contract, breach of fiduciary duty, negligent supervision, and negligence involving the Hempstead property; (2) denies Atlas' motion for summary judgment as to the claims of negligence involving the Willoughby Avenue and Jackson Heights properties, fraud and conspiracy to commit fraud; and (3) denies Liberty's and Plaintiff's cross-motions for summary judgment as to all claims against Liberty.

SO ORDERED:

_____ s/ MKB _____
MARGO K. BRODIE
United States District Judge

Dated: September 26, 2014
          Brooklyn, New York